No. 19-1056 – *State ex rel. Patrick Morrisey, Attorney General v. Diocese of Wheeling-Charleston et al*

FILED

November 16, 2020

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

WORKMAN, J., dissenting:

The majority opinion is transparently result-oriented which explains its logical incoherence and sins of omission. The issue before the Court is one of fairness and honesty in commercial communications to the public---potential purchasers of goods and services. The fundamental question involves matters of unfair or deceptive acts or practices in advertising or selling and in advertising based on false promises. That is all. Nothing else is at issue. This case has absolutely nothing to do with the free exercise or expression of religious thought and nothing to do with regulating religious institutions in the sense of excessive State entanglement. As brought and pled by the State, what is at issue is alleged false promises and deceptive advertising promoting a safe environment aimed at getting students and campers to attend for-fee-based schools and camps, when alleged facts indicated the contrary to be true.

The West Virginia Consumer Credit and Protection Act (hereinafter "CCPA") prohibits unfair methods of competition and unfair or deceptive acts or practices when advertising or selling any goods or services, including educational and recreational services. W.Va. Code §§ 46A-6-104, -1-102(47) (2015). Additionally, pursuant to the provisions of the CCPA, advertisements based on false promises and sales that conceal or

1

omit material facts are within the reach of the statute. W.Va. Code §§ 46A-6-102 (7)(I), (L), (M) (2015).

In March 2019, the Attorney General of West Virginia (hereinafter "the Attorney General") on behalf of the State of West Virginia filed the underlying action against the Diocese of Wheeling Charleston and Michael Bransfield in his capacity as former Bishop of the Diocese of Wheeling-Charleston (hereinafter "the Diocese") alleging three violations of the CCPA in advertising and selling educational and recreational, specifically camps, services to the public. According to the amended complaint, the Diocese advertises and sells services to parents of children from kindergarten through high school and has nineteen elementary schools and six high schools serving over 5,000 children in West Virginia. Yearly fees for the educational services range from $6,000 to $8,000. The Diocese also provides partial scholarships, arranges financing through third parties, and uses in-house installment payment plans. Just as any other creditor may act, the Diocese has availed itself of the courts and legal system to enforce credit agreements.

It is alleged that the Diocese advertises to the public at large. Its schools and camps accept children and youth of all faiths and denominations and those of no faith. The Diocese has advertised since at least 1974 in various forms of media so as to compete for children who might otherwise attend other public or private schools.

2

According to the amended complaint, in 2002, the Diocese adopted a Safe Environment Program for the protection of minors from abuse by religious and lay employees of the Diocese and volunteers. The Safe Environment Program consisted of items such as background check requirements and policies regarding child sexual abuse and awareness training. The Diocese promoted the Safe Environment Program and the policies on its website promising a safe learning environment and informing the reader that employees and volunteers must pass background checks, be fingerprinted, and be trained in accordance with the Safe Environment Program policies. Like any other seller of for-fee educational and recreational services, the advertising and marketing goal seeks to promote its product in order to gain a competitive advantage. Certainly, by promoting safety initiatives, the Diocese sought to attract consumers away from competitors that did not advertise similar safety measures.

However, it is alleged that the advertisements did not disclose that at times the Diocese employed priests and laity convicted of, admitted to, or credibly accused of sexually abusing children. A list of some forty priests convicted or credibly accused in this State or other States before association in this State from 1950 to 2018 has been developed. The Diocese had a practice of concealing information about child abuse allegations despite a public letter in 2003 announcing a promise not to enter into confidential agreements in the future in order that the truth be known. The State alleges a number of specific fact situations involving credible sexual abuse allegations as well as some involving convictions regarding individuals at its schools and camps—none of which were

3

accompanied by any disclosure of incidents or conduct to parents of other children. The State also alleges instances where the Diocese did not abide by its advertisements that personnel in schools and camps are subject to background checks.

For its claims of failure to deliver advertised services, failure to warn of dangerous services, and unfair methods of competition, the State sought relief in the form of a declaration that the Diocese violated the CCPA, an injunction against further violations, and civil penalties. Significantly, the State expressly represented that nothing in the complaint "should be construed as an attempt to modify or interfere with doctrinal matters and hiring decisions." In other words, the State indicated it had no intent to interfere with religious matters and was interested only in protecting consumers from advertising in violation of the CCPA.

The Diocese filed a motion to dismiss. Upon briefing and oral argument, the circuit court certified two questions. The first question asked whether the CCPA prohibitions against unfair or deceptive acts or practices applied to the advertising of educational and recreational services by religious institutions. The second question asked whether applying the CCPA to religious entities selling or advertising educational or recreational services violated the religion clauses of the federal and state constitutions by causing excessive entanglement of church and state.

4

The majority reformulated the certified questions, but in doing so fell into the same proverbial rabbit hole as the circuit court did in framing the question in terms of religious institutions. The reframed question asks: "Do the deceptive practices provisions of the West Virginia Consumer Credit and Protection Act, West Virginia Code §§ 46A-6-101 to -106 (2015), apply to educational and recreational services offered by a religious institution?" Both the certified questions and the reframed question unnecessarily interject religion into a statute directed solely at protecting consumers from unfair, misleading or deceptive advertising, none of which infringes upon or is directed at constitutionally protected religious rights. The advertising at issue does not implicate religious principles. Nor does enforcement of the CCPA as to deceptive advertising carry with it any infringement on religion.

Rather, what is at issue is a matter of purely secular concern—providing a safe environment at school and at play. Specifically, if a seller of services seeks to compete in the marketplace with advertisement, then the seller must do so fairly and honestly. Not only does acting fairly and honestly serve the remedial purpose of the CCPA in protecting consumers, it also promotes sound business practices.

What is truly remarkable is that on the essential issue at the very core of this case the majority wholly adopts the reasoning of the State with respect to whether "services" as used in the CCPA includes education and recreation. The majority applied

5

basic and common definitions to words in the text of the CCPA in order to conclude that the term "services" as used in the CCPA included education and recreation.

So far—so good. Given the framing of the amended complaint, together with the fact that the proceedings are at the motion to dismiss stage, that should have concluded the matter. However, the majority proceeded to embark upon a misdirected effort at attacking a strawman position regarding religion; a position advanced by the Diocese and a complete red-herring. But, because it obviously did not want to engage in the heavy lifting of a meaningful, though complex and challenging examination of any religious rights implications, the majority chose to manufacture a nonexistent statutory conflict with a wholly unrelated statute. The conflict was manufactured in order to exempt religious institutions from compliance with the CCPA protections of consumers from unfair or deceptive acts and practices or false promises and concealment of material facts in advertising to the general public.

The purported conflict is said to be with the statutory provisions of "Private, Parochial or Church Schools, or Schools of a Religious Order." W. Va. Code §§ 18-28-1 to -7 (2016). The provisions of the statute places requirements on such institutions regarding matters consisting of minimum instructional days and average hours per day, maintenance of attendance and immunization records, the development and maintenance of school specific crisis plans, compliance with reasonable fire, health and safety inspections by state, county and municipal authorities, and compliance with bus safety

regulations. *Id*. § 18-28-2. The statute also provides for standardized testing requirements and permits voluntary participation in state programs and opportunities. *Id*. §§ 18-28-3, 4. These various requirements allow such schools to satisfy West Virginia's compulsory attendance requirements. When religious institutions meet such requirements with respect to schools, the statute provides that they "shall [not] be subject to any other provision of law *relating to education* except requirements of law respecting fire, safety, sanitation and immunization." *Id*. § 18-28-6 (emphasis added). The artificially created conflict is said to stem from the "relating to education" terminology of the statute. By fiat, the majority proceeded to conclude that whether the "relating to education" commands that enforcement of the deceptive practices provisions of the CCPA depends on assessing the qualities and substance of the education actually provided. This is a bald assertion unsupported by facts or analysis. As pled in the instant matter, there is simply no reason to delve into assessments of qualities or "pass judgment on the substantive educational services actually provided" in order to enforce the provisions of the CCPA.

There is no irreconcilable conflict between the provisions of West Virginia Code §§ 18-28-1 to -7 and the CCPA. The CCPA relates to consumer protection; not to regulating the quality or substance of educational services. Specifically, the CCPA goes to marketing, and, in the context of the instant matter, the marketing of educational and recreational services. It has as its purpose the broad and remedial goal of protecting consumers and promoting fair and honest competition. Requiring fairness when selling

7

advertising and selling educational and recreational services simply does not interfere with the services themselves.  Rather, it is the marketing of the services that is at issue.

The majority has ignored a cardinal principle of statutory construction that unless there is an irreconcilable conflict, statutes relating to the same subject matter "should be read and applied together" and construed "so as to give effect to each."  Syl. Pts. 8 and 9, in part, *Barber v. Camden Clark Mem'l Hosp. Corp.*, 240 W.Va. 663, 815 S.E.2d 474 (2018).  Here, the provisions of the CCPA can readily co-exist with the school attendance, testing, and health and safety requirements of West Virginia Code §§ 18-28-1 to -7, which does not address the advertisement or sale of educational services.  Announcing that the CCPA and the education statute are in conflict flies in the face of the fact that CCPA actions are routinely advanced as to other statutorily regulated activities without conflict.  *See, e.g., Calvary SPV1, LLC v. Morrisey*, 232 W.Va. 325, 752 S.E.2d 356 (2013) (CCPA actions are viable even though collection agencies must possess licenses, file surety bonds, and register with the tax department); *State ex rel. McGraw v. Telecheck Servs., Inc.*, 213 W.Va. 438, 582 S.E.2d 885 (2003) (CCPA action against credit reporting agency otherwise regulated federally); *State ex rel. McGraw v. Scott-Runyan Pontiac-Buick, Inc.*, 194 W.Va. 770, 461 S.E.2d 516 (1995) (CCPA actions are viable as to automobile dealers despite other regulations). Moreover, West Virginia Code §§ 18-28-1 to -7 simply do not regulate commercial components or consumer-focused marketing transactions.  The two are not in tension, let alone conflict!

8

Additionally, the Court is not faced with statutory silence because the CCPA explicitly includes fairness regarding educational services advertising and the majority correctly recognized this fact. The CCPA is a neutral and generally applicable remedial statute applying to consumer transactions. The legislative reach of protecting consumers with respect to educational services is plain. The Legislature could have exempted private, religious institutions from the CCPA, but it did not. Other types of enterprises were exempted from various portions of the CCPA including lawyers, accountants, stockbrokers, and licensed pawnbrokers. W. Va. Code §§ 46A-6C-2(b), -6F-202, -1-105(a)(5). "It is not for this Court arbitrarily to read into [a statute] that which it does not say." *Banker v. Banker*, 196 W.Va. 535, 546-47, 474 S.E.2d 465, 476-77 (1996). Here, in the face of explicit statutory inclusion found by the majority, the majority then decided to read into the CCPA an exclusion due to a purported conflict that the majority is unable to define or articulate. The two statutes contemplate distinct purposes. The private religious education statute does not purport to govern advertisement of education services. The CCPA does not purport to govern the delivery of substantive educational services. Nothing in either statute forecloses the application of the other.

An example is in order. Suppose that a religious institution advertises that the fees for a year of educational services are all-inclusive but for certain extra-curricular opportunities. Then, half-way through the school year, parents receive a building maintenance and utility charge requiring immediate payment or suffer the suspension of non-paying students. Suppose, further, that parents learn this has been a routine practice

9

over several years that deflates the advertised cost of schools by fifteen percent. Consider the Unitarian Universalist institution or the Quaker Religious Society of Friends falsely marketing their educational programs as having ten to one student teacher ratios. Cost and class size are important considerations of consumers in making their educational services selection. Under the majority's reasoning, religious institution are given license and incentive to make material misrepresentations about commercial, fee-generating educational ventures that have absolutely nothing to do with religious tenets, while a secular institution is subject to regulation, enforcement, and penalties.

Turning to an additional sleight of hand, most incredible is the sophistry exhibited in the opinion's bootstrapping into its unfounded conclusion the issue of recreational services. Specifically, West Virginia Code §§ 18-28-1 to -7 have no application whatsoever to recreational services or camps—none. That black letter fact did not prevent the majority from proceeding to simply add in "and recreational services" throughout the remainder of the opinion. This blatant bit of magic finds its way into the new syllabus point where it too will likely result in damage in the future. Imagine, if you will, religious institutions offering summer camps consisting of activities such as outdoor leadership and adventures, whitewater rafting, rock climbing, caving, mountain biking, football and marketing these for-fee camps as having fully certified professionals with thousands of hours of training in serving youth, emergency medical training, and qualified nurse practitioners on site. What if it simply was not true? There will be no recourse under the CCPA for the consumers who were deceived and the Attorney General will be deprived

10

of his or her enforcement responsibilities. The commercial, nonreligious private entities offering similar camps and programs will be competitively disadvantaged. The Legislature's goal of remedial legislation to be liberally construed will be soundly frustrated. Clearly, the nonsensical and unsupported leap from educational services to recreational services is illogical and lacks any statutory support—contrived or otherwise.

That portion of the majority opinion styled as "Services of a Religious Institution" is equally troubling in its willingness to merge issues and make pronouncements utterly void of any jurisprudential consideration. Simply quoting laudatory language of the public policy expressed in the relied-upon education statute promoting the uncontroversial concepts of religious liberty, religious opinions and beliefs, and the freedom to select religious instructors does not support a conclusion that the deceptive practices provisions of the CCPA depends on assessing the nature of the education supplied. How the public policy goal of keeping state law separate from intruding upon the content of religious instruction and thought precludes application of consumer protection provisions to marketing and advertising to the public at large, which in this case was about providing a safe environment, is left unexplained. Nothing about protecting or promoting religious freedom prevents appropriate protection of the consuming public relative to ensuring fair and honest competition under the CCPA. And, as already observed, nothing about the statute applies to recreational activities. *See* W. Va. Code §§ 18-28-1 to -7.

To use the majority's own language, the opinion is an "absurdity." Consider another example. Recognize first that the CCPA does not require educational or recreational services to do or undertake any certain acts. Suppose a religious institution—let's say a Jewish institution—advertises, to the public at large in order to attract educational or recreational customers, that they maintain security guards, metal screening at entrances, and exterior surveillance. But, in fact, they do not maintain such services. Thus, the advertisement is false. Again, the remedial purpose of the CCPA in protecting consumers from unfair, illegal, and deceptive acts and practices is destroyed. And, nothing about religious freedom, thought, or instruction is infringed upon by virtue of enforcing an act mandating that entities offering services for-fee tell the truth about the services. Consider an institution of Hindus and Buddhists organizing for the purpose of offering for-fee recreational yoga camps for the public and advertising that they will be led by individuals with specialized advanced training consisting of 1,000 hours from certified immersion-based programs. But, instead, the instructors have mere on-line, at home thirty-hour training certificates. Thus, there is patently false advertising with no enforcement action available.

The principle the majority ignores is that while the CCPA does not dictate to religious, or other, entities, what they can do in terms of education or recreational services; it does prohibit all entities, religious or not, from making representations that are demonstrably and materially false in their advertisements and marketing to the citizens of this State. The CCPA does not regulate or interfere with religious thought or education. It

12

does not dictate doctrinal principles, disciplinary processes, curriculum choices, testing, or internal religious affairs. And, in the instant case, the State repeatedly strives in pleadings and in argument to demonstrate that it has no intention, and does not seek, to intrude upon internal religious affairs, thought or teaching. It seems the majority opinion is driven to its result-oriented conclusions by an underlying concern that applying the CCPA to marketing for-fee schools and camps by religious institutions would result in overly broad enforcement actions and improper remedies. But those issues are not before this Court. Certainly, remedies must be fashioned to fit whatever facts are proven and they must not infringe on religious freedoms. However, those are matters for another day with developed facts and proposed remedies. Allowing issues of remedies to confound application and enforcement of the CCPA is tantamount to allowing the tail to wag the dog.

In conclusion, the majority opinion slams the door shut on enforcement of even the most blatant unfair or deceptive commercial conduct on the grounds that false or misleading advertising was perpetrated by a religious institution. The majority grafted onto the CCPA a blanket exemption for religious entities that are operating and competing in the commercial marketplace. The educational and recreational services provided by these religious institutions are undertaken for fees and marketed to the public at large for a purely secular purpose—enticing buyers and selling product. Ironically, religious institutions have been given an unfair marketplace advantage with respect to their commercial enterprises.

Accordingly, I respectfully dissent.

13